## APPEAL OF FIRST BOND & MORTGAGE CO.

Docket No. 6095.   Decided July 30, 1926.

1. Premiums received on the sale of capital stock *held* to constitute paid-in surplus and properly included in invested capital.

2. Under the facts in this case, *held*, that notes given to cover unpaid balances on stock subscriptions may be included in invested capital.

3. Where the Commissioner by his answer claims that invested capital should be reduced on account of taxes for the previous year in an amount greater than that used in determining the deficiency, he must show that the amount of such taxes used in

his determination of the deficiency was not computed in accordance with the Regulations. Section 1207 of the Revenue Act of 1926.

*R. M. O'Hara, Esq.*, for the petitioner. .
*A. H. Murray, Esq.*, for the Commissioner.

Before ARUNDELL and LANSDON.

This is an appeal from the determination of a deficiency in income and profits taxes in the amount of $2,853.52 for the calendar year 1921. The petitioner alleges error on the part of the Commissioner in excluding from invested capital (1) premiums on the sale of stock, (2) the face value of notes of subscribers to capital stock, and (3) expenses incurred in connection with sales of capital stock.

The Commissioner by amendment to his answer avers that, whereas he reduced invested capital by prorating the tax for the prior year, he should have made a reduction in the full amount of the tax.

### FINDINGS OF FACT.

The petitioner is a Delaware corporation with its principal office at Lansing, Mich. It was organized in November, 1919, and at that time took over the property of a Michigan corporation having the same name, issuing in exchange therefor $250,000 par value of its common stock.

On November 26, 1919, the petitioner started a campaign to sell the remainder of its capital stock, which consisted of 50,000 shares of preferred stock and 25,000 shares of common stock, the shares in both classes having a par value of $10 each. The stock was offered for sale in blocks of two shares of preferred and one share of common stock at a price of $35 per block. During the period November 26, 1919, to September 13, 1920, it sold or received subscriptions for 24,554 shares of preferred and 12,277 shares of common stock of a total par value of $368,310, at a price of $415,696, or $47,386 in excess of par value. Of this latter amount the taxpayer transferred $10,000 to surplus, which was allowed by the Commissioner as an item of invested capital.

The stock subscription agreement used by the taxpayer reads in part as follows:

AGREEMENT between the FIRST BOND & MORTGAGE COMPANY

of Lansing, Michigan, hereinafter called " Company " and _____
_____ of _____
hereinafter called " Subscriber."

WITNESSETH the Company agrees to sell to the Subscriber and the Subscriber agrees to purchase _____ shares of Preferred Stock and _____ shares of Common Stock of the Company, of the par value of Ten Dollars each full paid and non-assessable at and for the sum of _____ Dollars
Purchase Price

payable as follows: _____ Dollars in cash, receipt of which is hereby acknowledged and the balance in installments of _____ Dollars or more on the _____ day of each and every month·hereafter until the full purchase price shall have been paid.

When the Subscriber has made all of the payments above specified the Company agrees that it will deliver to said Subscriber, his heirs or representatives, certificates of said Preferred or Common Stock and dividends on the Preferred Stock accumulated from the date of issue.

If the Subscriber shall fail to pay any of said installments when due and said default shall continue for at least thirty days, then and in such case the Company may, at its option, while such default continues, terminate this agreement and all rights of the Subscriber thereunder; but in case of sickness actually preventing punctual payment, the Company will, if it receives prompt notice and satisfactory proof of such sickness, grant reasonable extensions on payments so prevented, but such extension taken together shall not exceed six months during the life of this contract.

Subscription contracts are not subject to cancellation either wholly or in part.

Agents are not authorized to make any alterations in the within agreement.

The Company reserves the right to reject any or all subscriptions, to withdraw this offer and to increase the subscription price without notice.

With every subscription the petitioner secured at least 10 per cent of the subscription price in cash and for the balance obtained the subscribers' promissory notes, which bore interest at the rate of 7 per cent. In each case where a note was given by a subscriber, an officer of the company made an investigation through banks and through the credit exchange to determine the solvency and the credit standing of the maker. In some cases the notes were rejected. Upon the acceptance of subscriptions, the petitioner executed certificates for the stock subscribed for but did not deliver them to the subscribers until full payment was made. Dividends which accrued on stock subscribed for, but held by the petitioner pending receipt of full payment, were paid to the subscribers.

In carrying out the stock sales campaign during the period November 26, 1919, to September 13, 1920, the petitioner incurred the following expenses:

| | |
|---|---:|
| Commissions on sales of stock | $25, 424. 56 |
| Salaries | 2, 800. 90 |
| Advertising | 220. 66 |
| Rent | 185. 00 |
| Stationery and books | 393. 65 |
| Telegraph and telephone | 9. 00 |
| | $29, 033. 77 |
| Miscellaneous | 11, 601 81 |
| Total | 40, 635. 58 |

In winding up the sales campaign during the remainder of 1920 and 1921, the taxpayer incurred expenses as follows:

| Commissions | $1,605.80 | |
|---|---|---|
| Salaries | 519.93 | |
| Advertising | 3.92 | |
| | | $2,129.65 |
| Miscellaneous | | 8,716.97 |
| Total | | 10,846.62 |

The expenses were carried in a journal used to record the daily sales of stock, commissions, salaries, and other expenses incurred in connection with the sales of stock. They were not carried into the petitioner's general books of account either as an expense or charge to any asset account, but were used merely as a reduction of the total amount received from stock subscriptions.

In computing the deficiency here involved the Commissioner reduced the invested capital for 1920 in the amount of $416.65, representing a prorated portion of the income and profits tax of $985.91 for 1920.

OPINION.

ARUNDELL: The petitioner claims the right to include in invested capital the premiums on the sale of its capital stock. Of the total premiums received the petitioner transferred $10,000 to its surplus account, and this amount was included by the Commissioner in invested capital in his computation. The balance of the amount of premiums was not carried in the petitioner's general books of account. Premiums received on the sale of capital stock constitute paid-in surplus and are properly included in invested capital. The invested capital of the petitioner in this case should accordingly be increased in the amount of $37,386, representing the difference between the total premiums of $47,386 and the amount of $10,000 allowed by the Commissioner. This amount is not the same as that claimed by the petitioner, but it is the amount which has been determined to be correct after a great deal of checking on our part of the books and records placed in evidence.

With respect to the notes accepted by the petitioner to cover the unpaid balance on stock subscriptions, we find that the petitioner satisfied itself as to the solvency of the makers, issued the stock subscribed for, although it did not make delivery, and paid to the subscribers dividends that accrued during the time it held the stock. In view of these facts, we are of the opinion that the notes were *bona fide* paid in for stock and should be allowed as an item of invested capital. The amount of the notes is not shown by the record. If the taxpayer can satisfy the Commissioner as to the amount of the notes, they may be allowed in invested capital.

The evidence shows, as set forth in the findings of fact, that in conducting a stock sales campaign the petitioner incurred expenses

in 1919, 1920, and 1921, in the aggregate amount of $51,482.20. Of this amount, it identified as commissions, salaries, etc., amounts totaling $31,163.42. The items making up the amount under the heading "Miscellaneous" were not identified by the taxpayer, nor is any claim with respect thereto made in this appeal. The total of the amounts proved by the taxpayer to have been spent as organization expenses is properly an item of invested capital. But in this case the organization expenses were paid out of the premiums received on the sale of capital stock and thus the restoration to invested capital of the full amount of premiums on the sale of capital stock carries with it the inclusion in invested capital of the amount of organization expenses. To allow the inclusion of the full amount of the premiums and also the organization expenses would be to make a double allowance for the organization expenses.

The contention of the Commissioner with respect to reduction of surplus by the amount of the prior year's taxes is now settled by section 1207 of the Revenue Act of 1926. Article 845 of Regulations 62 provides that, in reducing invested capital on account of taxes for prior years, such taxes shall be averaged for the proportionate part of the taxable year after the tax is due and payable. This does not give the Commissioner the right to reduce invested capital by the full amount of the tax for the previous year. No showing has been made by the Commissioner that the proration of the 1920 tax, as set forth in his determination, was not in accordance with the Regulations, and his contention with respect thereto must be rejected.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*